IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CBT FLINT PARTNERS, LLC,

    Plaintiff,

      v.

                              CIVIL ACTION FILE
                              NO. 1:07-CV-1822-TWT

RETURN PATH, INC., et al.,

    Defendants.

ORDER

    This is a patent infringement action. It is before the Court for construction of the disputed claims in United States Patent Nos. 6,192,114 and 6,587,550.

I. Background

    On August 1, 2007, CBT Flint Partners, LLC filed its Complaint against Goodmail Systems, Inc., Return Path, Inc., and Cisco IronPort Systems LLC, alleging patent infringement. CBT alleges that it owns United States Patent No. 6,192,114 ("the '114 Patent") entitled "Method And Apparatus For Billing A Fee To A Party Initiating An Electronic Mail Communication When The Party Is Not On An Authorization List Associated With The Party To Whom The Communication Is Directed," and United States Patent No. 6,587,550 ("the '550 Patent") entitled "Method And Apparatus For Enabling A Fee To Be Charged To A Party Initiating An

Electronic Mail Communication When The Party Is Not On An Authorization List Associated With The Party To Whom The Communication Is Directed." (Compl. at 4-5.) The parties disagree as to the construction of several phrases in the patent claims.

## II. Claims Construction Rules

The construction of claims in a patent case is a matter of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). In construing patent claims, the Court looks first to the intrinsic evidence. The intrinsic evidence consists of the patent itself, the claim terms, the specification (or written description), and the patent prosecution history, if in evidence. Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1346 (Fed. Cir. 2004). However, not all intrinsic evidence is equal. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). First among intrinsic evidence is the claim language. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). A "bedrock principle" of patent law is that the claims of the patent define the patentee's invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Thus, the Court's focus must "begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." Gillette Co. v.

Energizer Holdings, Inc., 405 F.3d 1367, 1370 (Fed. Cir. 2005) (quoting Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)); see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").  When reading claim language, terms are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. Phillips, 415 F.3d at 1313-14.

As a result, an objective baseline from which to begin a claim construction is to determine how a person of ordinary skill in the relevant art would understand the terms.  Phillips, 415 F.3d at 1313.  Although "the claims of the patent, not its specifications, measure the invention," Smith v. Snow, 294 U.S. 1, 11 (1935), the person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification, rather than solely in the context of the particular claim in which the disputed term appears.  Phillips, 415 F.3d at 1313.  For instance, the patentee may act as his own lexicographer and set forth a special definition for a claim term.  Id. at 1316.

Claims are part of a "fully integrated written instrument" and, therefore, "must be read in view of the specification, of which they are a part."  Phillips, 415 F.3d at

1315.  In fact, the specification is "the single best guide to the meaning of a disputed

term" and is often dispositive.  Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90

F.3d 1576, 1582 (Fed. Cir. 1996)).  "It is therefore entirely appropriate for a court,

when conducting claim construction, to rely heavily on the written description for

guidance as to the meaning of the claims." Phillips, 415 F.3d at 1317.  Nevertheless,

the Court must be careful not to read a limitation into a claim from the specification.

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004).   In

particular, the Court cannot limit the invention to the specific examples or preferred

embodiments found in the specification.  Phillips, 415 F.3d at 1323; see also Resonate

Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364-65 (Fed. Cir. 2003) ("[A]

particular embodiment appearing in the written description may not be read into a

claim when the claim is broader than the embodiment.").   In addition to the

specification, the prosecution history may be used to determine if the patentee limited

the scope of the claims during the patent prosecution.  Southwall Techs., Inc. v.

Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).  The prosecution history helps

to demonstrate how the patentee and the Patent and Trademark Office ("PTO")

understood the patent.  Phillips, 415 F.3d at 1317.  However, because the prosecution

history represents the ongoing negotiations between the PTO and the patentee, rather

than a final product, it is not as useful as the specification for claim construction purposes.  Id.

Extrinsic evidence – such as expert and inventor testimony, dictionaries, and learned treatises – is only considered when the claim language remains genuinely ambiguous after considering all of the patent's intrinsic evidence.  Tegal Corp. v. Tokyo Electron America, Inc., 257 F.3d 1331, 1342 (Fed. Cir. 2001).  Although less reliable than the patent and prosecution history in determining construction of claim terms, extrinsic evidence may be used to help the Court understand the technology or educate itself about the invention.  Phillips, 415 F.3d at 1317; Vitronics Corp., 90 F.3d at 1584.  In particular, because technical dictionaries collect accepted meanings for terms in various scientific and technical fields, they can be useful in claim construction by providing a better understanding of the underlying technology and the way in which one skilled in the art might use the claim terms.  Phillips, 415 F.3d at 1318.  But extrinsic evidence, including dictionary definitions, cannot be used to vary or contradict the terms of the patent claims.  Tegal Corp., 257 F.3d at 1342; see also Vitronics Corp., 90 F.3d at 1584 n.6 (courts are free to consult dictionaries "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"); Phillips, 415 F.3d at 1322-23.

## III.  Discussion

### A.  The '114 Patent

The parties dispute the scope of several terms in the '114 Patent.  First, the parties disagree about the meaning of the phrase "authorized sending party" as it appears in claims 1[1], 5[2], 6[3], and 7[4] of the '114 Patent.

---

[1] Claim 1 reads: An apparatus for determining whether a sending party sending an electronic mail communication directed to an intended receiving party is an authorized sending party, the apparatus comprising:

> a computer in communication with a network, the computer being programmed to detect an indication of a source of the electronic mail communication initiated by the sending party and to compare the indication to an authorization list to determine whether or not the sending party is an authorized sending party, the authorization list corresponding to a list of sending parties from whom the intended receiving party is willing to receive electronic mail communications, wherein the computer, upon determining that a sending party is not an authorized sending party, calculates a fee to be charged to the unauthorized sending party.

[2] Claim 5 reads: The apparatus of claim 1, wherein the computer, upon determining that a sending party is not an authorized sending party, discards the electronic mail communication sent by the authorizing party.

[3] Claim 6 reads: An apparatus for determining whether a sending party sending an electronic mail communication to an intended receiving party is an authorized sending party, the apparatus comprising:

> means in communication with a network for detecting an indication of a origin of an electronic mail communication initiated by the sending party and for comparing the indication to an authorization list to determine whether or not the sending party is an authorized sending party, the authorization list corresponding to a list of sending parties from whom the intended receiving party will receive electronic mail communications, wherein the computer, upon

CBT contends that in claim 1, "an authorized sending party" is a "party from whom the intended receiving party is willing to receive electronic mail communications." The Defendants seek to limit the definition further by adding the qualification "and whose e-email communications will be delivered to the intended receiving party free of charge." The claim language explicitly states that the basis for determining whether a party is an "authorized sending party" is by referencing the "authorization list" to determine whether the sending party is on that list. Therefore, the definition of an "authorized sending party" is bound up in the definition of "authorization list." Claim 1 provides that the "authorization list corresponding to a list of sending parties from whom the intended receiving party is willing to receive electronic mail communications." According to the claim language, the authorization

_____

determining that a sending party is not an authorized sending party, calculates a fee to be charged to the unauthorized sending party.

[4]Claim 7 reads: A method of determining whether a sending party sending an electronic mail communication to an intended receiving party is an authorized sending party, the method comprising the steps of:

comparing an indication of a source of the electronic mail communication with a list of authorized sending parties associated with the intended receiving party to determine whether or not the sending party is an authorized sending party, wherein if a determination is made that the sending party is not an authorized sending party, a fee is charged to the unauthorized sending party.

list provides an explicit benchmark for determining whether the "intended receiving party is willing to receive electronic mail communications."

The Court adopts CBT's construction of "authorized sending party" in the context of claims 1, 5, and 10. There is nothing that compels the Defendants' narrower reading. Although the claim provides that an apparatus will calculate a fee when an unauthorized sending party sends an email, there is nothing in the claim language that mandates that all authorized transmissions be delivered "free of charge." Therefore, in claims 1, 5, and 10, an "authorized sending party" is a "party from whom the intended receiving party is willing to receive electronic mail communications." In claim 6, however, an "authorized sending party" is "a party from whom the intended receiving party will receive electronic mail communications." This small change in definitions reflects the slightly different wordings of claims 1 and 6.

Second, the parties dispute the meaning of the phrase "authorization list" as it appears in claims 1 and 6. CBT contends that an "authorization list" is a "list of sending parties associated with one or more intended receiving parties including at least authorized sending parties." The Defendants argue that the phrase means "the list of authorized sending parties that have been selected by a particular intended receiving party." As noted above, claims 1 and 6 state that "the authorization list

correspond[s] to a list of sending parties from whom the intended receiving party will receive electronic mail communications."

The basic concept of the invention described in the '114 patent is the use of an "authorization list" to determine whether a sending party is an "authorized sending party" or an "unauthorized sending party." Authorized sending parties are distinguished from unauthorized sending parties by the inclusion of the former in an authorization list. Sending parties who are not included in the authorization list are unauthorized and must pay a fee for delivery or their e-mails. It is clear from the specification and the prosecution history that it is the recipient of the e-mail who selects the names on the list. The specification does disclose an embodiment in which a network administrator selects an authorized sending party to be included on an authorization list. Col. 2, ll. 11-16 ("[T]he present invention could be implemented to allow users or system administrators to decide which parties' or entities' email communications will be received by the intended recipient."). However, this alternative embodiment of the invention cannot broaden the scope of the claims beyond their common and ordinary meaning. The Defendants are correct that the definition of "authorization list" requires an assessment of whether the sending party "is willing" to receive such communications. A list of sending parties completely unassociated with the receiving party is outside the scope of the claim.

CBT contends that the authorization list is comprised of "a list of authorized sending parties *associated* with one or more intended receiving parties including *at least* authorized sending parties." CBT bases its interpretation on the fact that claim 1 states that the "authorization list *correspond[s]* to a list of sending parties. . . ." Drawing on a definition from the American Heritage Dictionary, CBT contends that corresponding means "having the same or nearly the same relationship." (3d ed. 1997). But just because the word can mean having the "same" or "nearly the same relationship" does not mean that CBT is automatically entitled to draw upon the broader definition of the word (i.e., "nearly the same"). The context of the claim language suggests a one-to-one relationship with sending parties directly corresponding to intended receiving parties. Reading the "authorization list" to include more than authorized sending parties on the "authorization list" would seem to simultaneously include "authorized" as well as "unauthorized" sending parties. I find no support for CBT's assertion that "unauthorized sending parties" may appear on the authorization list. The common and ordinary meaning of "authorization list" cannot be stretched to cover a list of unauthorized senders. Such an interpretation of the term is inconsistent with the specification and completely incompatible with the claims made by CBT in the prosecution history. Therefore, in claims 1, 6 and 10, the Court adopts the following construction of "authorization list" as "a list of authorized

sending parties that have been selected by an intended receiving party." Similarly, an "unauthorized sending party" is "a sending party who is not on the authorization list."

Next, the parties disagree about the sequencing of steps found in claims 1, 6, and 10 based on the following phrase: "wherein the computer, upon determining that a sending party is not an authorized sending party, calculates a fee to be charged to the unauthorized sending party." The Defendants contend that the steps in claims 1 and 6 must be performed in the order recited: "(1) detect, then (2) compare, and then (3) calculates." CBT essentially agrees that the first two steps happen sequentially. The computer must first detect an indication of the source of the email before it can compare the indication to an authorization list. CBT's main contention is that fee calculation can happen at anytime.

There is no need to decide whether the computer must "detect" before it "compares." It does seem logical that it would have to detect before it could compare, otherwise the computer would have no idea what it was comparing. But it is conceivable that these two steps could occur simultaneously. In either event, the Court finds that, based on the implied order of steps found in the claim language, the computer cannot "compare" before it has "detected." It must either "detect" first (and then "compare") or simultaneously "detect" and "compare." Furthermore, the Court finds that the fee calculation must sequentially follow the "detect" and "compare"

steps. Claim 1 explicitly states that the computer does not "calculate[] a fee" until the computer "determin[es] that a sending party is not an authorized sending party." It does this by using the word "upon" ("wherein the computer, *upon* determining that a sending party is not an authorized sending party, calculates a fee to be charged to the authorized sending party."). Webster's Third New International Dictionary includes a definition of "upon" that states "immediately following on: very soon thereafter." Thus, sequencing is implied by the claim language and expressed by proper construction of the word "upon." Furthermore, alternate constructions do not make sense. It is unclear what basis the computer would use to calculate a fee if it had no reason to perform such calculations. Therefore, the Court finds that there is a sequencing element in the steps recited in claims 1 and 6.

The Court finds that claim 10 also requires limited to the sequencing of the recited steps. Admittedly, claim 10 does not include the word "upon." Rather, it reads: "wherein if a determination is made that the sending party is not an authorized sending party, a fee is charged to the unauthorized sending party." Although CBT makes much of the fact that claim 10 says "a determination" and not "*the* determination," this difference cannot affect the question of whether the fee calculation must come after the prior step of "determin[ing]." The clause reads like an "if-then" statement. If a determination is made, *then* a fee is charged. The "then"

is implied by the structure of the sentence, and by the fact that the computer's determination is a logical precondition to whether a fee is charged.

The Defendants next argue that claim 6 is invalid. They argue that CBT relies on 35 U.S.C. § 112, paragraph 6 to support the claim, but that the provision does not apply because claim 6 does not claim a "combination" as required by statute. See 35 U.S.C. § 112 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."). Therefore, they argue, the claim is indefinite under 35 U.S.C. § 112, paragraph 1.

CBT describes claim 6 as a "means-plus-function claim." In its view, the claimed function is: the "means . . . for detecting an indication or an origin of an electronic mail communication . . . and for comparing the indication to an authorization list." The structure identified in the specification that performs the function is "a computer or multiple computers in communication with each other." CBT points to specification language stating that "the ISP server analyzes the destination address and the source address to determine whether the source address is on a list of authorized source addresses associated with the destination address."

Col. 2, ll. 33-37; see also Col. 3, ll. 19-24 ("In order to perform this task, a *computer* (not shown) located at the ISP compares the source address with a list of source addresses associated with the destination address to determine whether the source address is an authorized source address."); Col. 3, l. 65-Col. 4, l. 7 ("The *computer* at the ISP decodes the datagram and obtains the source and destination addresses, as indicated at block 15. The computer then compares the source address with a list of source addresses associated with the destination address and makes a determination as to whether the source address is on a list of authorized source addresses, as indicated at block 16 and 17."). CBT also contends that the specification discloses that the claimed functions can be performed by multiple computers on a distributed network. Col. 2, ll. 24-26 ("The present invention is also not limited with respect to the location at which the method and/or apparatus are located in the communications network.").

The Defendants contend that the claim is a "single-means-claim," and, therefore, is not a "combination" as required by statute. They argue that claim 6 only recites "one means." Furthermore, claim 7 provides proof that claim 6 is a single-means-claim. It refers to claim 6's use of the word "means" as "said means," suggesting that claim 6 refers to a singular means. ("The apparatus of claim 6, wherein *said means* is located at an Internet Service Provider servicing the intended

receiving party.") (emphasis added).  CBT, on the other hand, argues that claim 6 is

a combination of at least a means of "detecting," a means of "comparing" and an

authorization list.  Furthermore, it argues that claim 6 recites a network.  CBT asks the

Court to construe the relevant structure as: "one or more computers in communication

with each other."

The key question is: what is a combination?  To answer this question, the

Defendants point the Court to <u>In re Hyatt</u>, 708 F.2d 712, 714 (Fed. Cir. 1983), as

support for its contention that claim 6 recites only a single means - not a combination.

The Defendants quote the following language as proof of the standard for determining

whether a claim recites a combination:

> A claim must be read in accordance with the precepts of English
> grammar.  In claim 35, the invention defined is what follows the word
> "comprising."  Indeed, appellant has admitted that claim 35 is drawn
> to only a single element when he asserts that it is not drawn to a
> combination.  Appellant's denomination of every noun in the claim
> as a separate element ignores the fact that these words function as
> mere description of the single claimed means.

<u>Id.</u> This language hardly proves that claim 6 does not claim a "combination."  The

quoted section from <u>In re Hyatt</u> quite clearly states that in that case, neither party

disputed that the language in question did not claim a combination.  <u>Id.</u> ("Indeed,

appellant has admitted that claim 35 is drawn to only a single element . . .").

Therefore, <u>In re Hyatt</u> provides little by way of an answer to the question: what counts

as a combination?  Furthermore, claim 35 referenced in <u>In re Hyatt</u> was for a "means for incrementally generating the Fourier transformed incremental output signals in response to the incremental input signals."  <u>Id.</u> at 712-13.  In this case, the "means" described includes both means in communication with a network for detecting, and a means for comparing any indication to an authorization list.

The Defendants argue that CBT's "denomination of every noun in the claim as a separate element ignores the fact that these words function as mere description of the single claimed means."  <u>Id.</u>  For starters, "detect" and "compare" are verbs.  In <u>In re Hyatt</u>, the appellant unsuccessfully attempted to describe all of the nouns referenced as separate elements.  <u>Id.</u> (noting appellant's unsuccessful attempt to describe a "processor," "output signals," and "input signals" as separate combinable elements). Furthermore, detection and comparison are not the same thing.  The Defendants also put forth no standard for determining when a claim recites a combination.  In their view, anytime a patentee uses the word "means," a combination can never exist since everything that follows the word means would only be "additional functions performed by the means, and . . . not separate element[s]." (Defs.' Opening Claim Construction Br., at 42 n.17.)

In the Defendants' Responsive Claims Construction Brief, they argue, for the first time, that even if the Court treats claim 6 as a combination, CBT's proposed

construction fails to satisfy section 112, paragraph 6 because a "computer-implemented means-plus-function claim element cannot merely be a general purpose computer or computers; rather there must be a specific algorithm for performing the recited functions."  Although this argument is presented for the first time in the Defendants' Responsive Brief, it does directly address CBT's contention that the structure identified should not fail for lack of indefiniteness.  The Federal Circuit has recently stated that:

> In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has *consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor.* The point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming.

Aristocrat Techs. Australia Pty Ltd. v. International Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008) (emphasis added).  "For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to *pure functional claiming*. Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by

section 112 paragraph 6." Id. In order to claim such a means, CBT must have disclosed the algorithm. Id. ("The question thus is not whether the algorithm that was disclosed was described with sufficient specificity, but whether an algorithm was disclosed at all."). Therefore, the means-plus-function limitations of claim 6 lacks sufficient disclosure of structure under 35 U.S.C. § 112 ¶ 6 and is therefore indefinite under 35 U.S.C. § 112 ¶ 2.

There is also disagreement as to the meaning of the phrase "sending party" in claims 1, 3, 4, 5, 6, 8, 9, and 10. The Defendants construe "sending party" to mean a "person or entity who originates an e-mail communication." CBT's view is that the phrase requires no construction and is entitled to its plain and ordinary meaning: a "person or entity that sends an electronic mail communication." The differences between the two proposed constructions are small. The dispute is whether "sending party" should be defined as one who "originates," or whether the term is self-explanatory. The Court adopts only part of the Defendants' proposed construction. A "sending party" is a "person or entity that sends an email." To the extent that "senders" may be confused with ISPs that transmit the message, it seems reasonable to conclude that ISPs that merely transmit would not be considered senders. Otherwise, a single message, transmitted by an individual once he pushed the "send" button on his email interface, would have multiple "senders" - the party that sent the

email and the ISP that transmitted it. The claim language does not appear to support such a result.

The Defendants urge the Court to define the phrase "intended receiving party" used in claims 1, 2, 6, 7, and 10. In the Court's view, this phrase needs no construction, and it is entitled to its ordinary meaning: the person or entity to whom the electronic mail communication was intended to be sent. The Defendants urge the Court to adopt the following definition: "person or entity to whom an e-mail communication is addressed." But, again, the claim's language does not compel this narrower reading. Although looking to the email address is obviously a bright-line method of interpreting the "intent" of the sending party, the language does not exclude the possibility of relying on other indicators of intent. Therefore, the Court rejects the Defendants' proposed construction.

The Defendants ask the Court to interpret the phrases "indication of a source" (claims 1 and 10) and "indication of an origin" (claim 6). The Defendants contend that an "indication of a source" is an "indication of the identity of the sending party," and that an "indication of an origin" is an "indication of the identity of the sending party." In other words, "source" and "origin" mean the same thing: identity. CBT, again, argues that neither phrase requires construction, and that each is entitled to its plain and ordinary meaning. The claim language makes no direct reference to

"identity," but only source and origin. Based on the claim language, it appears that sources and origins might include more than mere identity. For example, an origin or source could refer to a "source address,"[5] but the words might also refer to "the name of the sending party."[6] Although "identity" appears to be one aspect of the source or origin of an indication, it is not exhaustive. The Defendants have failed to provide any cogent reason for limiting "source" or "origin" to "identity." And they have failed to demonstrate that using the word "identity" adds any more clarity than the words actually used in the patent. In context, the plain and ordinary meaning of "source" and "origin" as either the party or the location from where the email "originates" is clear enough.

---

[5] Claim 3 provides, "The apparatus of claim 2, wherein said indication corresponds to a source address associated with the sending party."

[6] Claim 4 reads, "The apparatus of claim 2, wherein said indication corresponds to the name of the sending party."

B. The '550 Patent

The parties dispute several terms in claim 13 of the '550 Patent.[7]  First, the phrase "authorized sending party" is disputed.  Both parties propose nearly identical constructions.  CBT's construction mirrors the language of claim 13: "A party for whom an agreement to pay an advertising fee in return for allowing an electronic mail communication sent by the sending party to be forwarded over the network to an electronic mail address associated with the intended receiving party has been made."  The Defendants' construction is slightly different: "A sending party who has agreed in advance to pay an advertising fee in exchange for allowing the sending party's email communication to be delivered to a particular intended receiving party."  Because the Defendants' construction deviates, albeit slightly, from the claim

---

[7]Claim 13 reads: An apparatus for determining whether a sending party sending an electronic mail communication directed to an intended receiving party is an **authorized sending party**, the apparatus comprising:

a computer in communication with a network, the computer being programmed to **detect analyze** the electronic mail communication sent by the sending party to determine whether or not the sending party is an authorized sending party or an unauthorized sending party, and wherein authorized sending parties are parties for whom an agreement to pay an advertising fee in return for allowing an electronic mail communication sent by the sending party to be forwarded over the network to an electronic mail address associated with the intended receiving party has been made.

language, and adds nothing by way of clarity, the Court adopts CBT's proposed construction.

The Defendants propose constructions for various phrases such as "advertising fee," "sending party," and "intended receiving party." These terms require no claim construction and are entitled to their plain and ordinary meaning. Although the parties seek a construction of the phrase "detect analyze," these arguments will be addressed in the context of the Defendants' Motion for Summary Judgment [Doc. 111].

IV. Conclusion

For the reasons set forth above, the disputed terms in the '114 and '550 Patents will be construed in the manner described above.

SO ORDERED, this 10 day of July, 2008.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge