IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CBT FLINT PARTNERS, LLC,

    Plaintiff,

      v.

RETURN PATH, INC., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:07-CV-1822-TWT

ORDER

This is a patent infringement action. It is before the Court on the Defendants'

Motion for Summary Judgment [Doc. 280]. For the reasons set forth below, the Court

GRANTS the Defendants' motion.

I. Background

CBT Flint Partners, LLC ("CBT") is a Georgia-based telecommunications

company. In 2003, the United States Patent and Trademark Office issued U.S. Patent

No. 6,587,550 (the "550 Patent") to CBT. The 550 Patent describes a device designed

to manage and control unwanted email messages, known as "spam" [see Doc. 280-3,

Ex. B]. The 550 Patent is based on the premise that legitimate advertisers are often

willing to pay a fee to have their emails delivered. Illegitimate advertisers, or

"spammers," are usually unwilling to pay such a fee [id.].

Claim 13 of the 550 Patent states:

> 13. An apparatus for determining whether a sending party sending an electronic mail communication directed to an intended receiving party is an authorized sending party, the apparatus comprising:
>
> a computer in communication with a network, the computer being programmed to detect analyze the electronic mail communication sent by the sending party to determine whether or not the sending party is an authorized sending party or an unauthorized sending party, and wherein the authorized sending parties are parties for whom an agreement to pay an advertising fee in return for allowing an electronic mail communication sent by the sending party to be forwarded over the network to an electronic mail address associated with the intended receiving party has been made.

[Doc. 280-3]. Claim 13 was added during the prosecution of the 550 Patent. Initially, the claims inspector rejected CBT's patent application on double patenting grounds. [see Doc. 280-3, Ex. B]. CBT ultimately amended the application to add Claims 13 and 14, along with a terminal disclaimer.

In 1997, Esther Dyson published a book entitled *Release 2.0: A Design for Living in the Digital Age* (the "Dyson Reference") [Doc. 280-3, Ex. G]. The book discussed technology that would allow internet service providers ("ISPs") to determine whether an email sender was listed in a recipient's address book. If the sender was listed in the address book, the ISP would deliver the email. If the sender was not in the address book, the Dyson Reference states that "[the intended recipient would] charge $1 a message from people not listed in [the recipient's] personal

address book or not members of the communities [the recipient] specif[ies], refundable if [the recipient] repl[ied]" [id., at 120].

In 1995, Bill Gates, the founder of Microsoft, published a book entitled *The Road Ahead* (the "Gates Reference"). Describing the future of email technology, the Gates Reference predicts "[y]ou might instruct your computer to refuse all mail that doesn't fit into one of your designated folders and to which no fee is attached" [id., Ex. I, at 198]. Further, "[a]dvertising messages, like the rest of your incoming network mail, will be stored in various folders. . . [A]dvertisements and message from people and organizations you don't know could be sorted by how much money was attached to them" [id.]. The Gates Reference proposes that "[o]ne way for the advertiser to capture [the recipient's] attention will be to offer [the recipient] a small amount of money - a nickel or a dollar, say - if [the recipient] will look at their ad" [id.].

On December 7, 1999, the U.S. Patent Office issued Patent No. 5,999,967 (the "Sundsted Patent") [Doc. 280-3, Ex. J]. The Sundsted Patent describes "[c]ontent based filters [that will] examine the address of the sender of the electronic mail, the subject of the electronic mail, or the body of the electronic mail in order to decide what action to take" [id., Ex. J]. Further, the Sundsted Patent states:

> A key component of this invention is the electronic stamp. Like a postage stamp, an electronic stamp must be attached to a piece of

> electronic mail before the receiver side will accept it. If the electronic
> stamp is not present, the receiver side will automatically reject the piece
> of electronic mail before the receiver ever sees it.

[Id.] If a stamp is present, a computer reads the value of the electronic stamp and compares that value to the recipient's desired compensation. "If the value of the stamp is greater than or equal to the desired compensation value, the electronic stamp and the associated electronic mail should be accepted" [id.].

Defendant Cisco IronPort Systems, LLC ("Cisco") and Return Path, Inc. ("Return Path") sell products designed to manage email message delivery. Until 2005, Cisco offered a Bonded Sender System (the "Bonded Sender List") designed to control the flow of email messages. The Bonded Sender List was a list of IP addresses. Email senders could apply for inclusion on the Bonded Sender List by paying an application fee. (Quinlan Dec. ¶ 10.) If the applicant met certain standards, its IP address would be placed on the Bonded Sender List. (Id. ¶¶ 11-12.) To remain on the Bonded Sender List, the sender was required to pay an annual fee. Those on the Bonded Sender List were also required to post a bond. (Gibson Dec., Ex. A, at 11.) If the sender's email conduct became unsatisfactory, a penalty would be assessed against the bond. (Id.) Eventually, if a sender's email practices continued to garner complaints, the sender would be removed from the Bonded Sender List.

In 2005, Return Path acquired the Bonded Sender List, changing the name to Sender Certified (the "Sender Certified List"). In April 2006, Return Path eliminated the bond requirement. (Bilbrey Dec. ¶ 2.) Like the Bonded Sender List, the Sender Certified List requires applicants to pay an application fee. Once approved, for-profit entities are required to pay an annual fee to remain on the Sender Certified List. (Gibson Dec., Ex. M.) Non-profit entities do not pay an annual fee. (Bilbrey Dec. ¶ 8.) The Sender Certified List makes no distinction between senders that have paid an annual fee and those that have not. (Id.)

In addition to the Bonded Sender List Cisco sold to Return Path, Cisco offers email security appliances known as message transfer agents ("MTAs"). The MTAs detect email passing over a network. After detecting an email, the MTAs reference Cisco's SenderBase Server. The SenderBase Server consults more than 100 data points to determine a "reputation score" for a given sender. Until 2006, the Bonded Server List was one of the criteria that the SenderBase Server used to determine a sender's reputation score. Since 2006, the SenderBase Server has continued to use the Sender Certified List as one of the criteria to determine a sender's reputation score. If a sender's reputation score is high enough, the MTAs allow the email message to be delivered to its intended recipient. If the reputation score is not high enough, the MTA will prevent the message from being delivered. Thus, the MTAs and

SenderBase Server seek to filter out spam while delivering legitimate email. Being on the Bonded Sender or Sender Certified List improves a sender's reputation score. Still, the MTAs may prevent an email from being delivered, even if the sender is listed on the Bonded Sender or Sender Certified List, if other factors damage the sender's reputation score. The reverse is also true. A sender not listed on the Bonded Sender or Sender Certified List may have its email messages delivered by the MTAs if other factors positively affect the sender's reputation score. (Gibson Dec., Ex. D, at 14.)

On August 1, 2007, CBT filed this lawsuit against Cisco and Return Path [Doc. 1]. The Plaintiff claims that the MTAs, in conjunction with the SenderBase Server, infringe the 550 Patent. CBT also alleges that the Bonded Sender List and the Sender Certified List indirectly infringe the 550 Patent. Specifically, the Plaintiff asserts that the MTAs consult the Bonded Sender and Sender Certified Lists to determine which parties are "authorized sending parties."

On February 26, 2008, the Defendants filed a Motion for Partial Summary Judgment, arguing that Claim 13 was indefinite and thus invalid [Doc. 111]. The Court granted the Defendants' motion on July 11, 2008 [Doc. 203]. The Court found that the phrase "detect analyze" in Claim 13 was ambiguous [id.]. CBT appealed this decision to the Federal Circuit [Doc. 269]. On August 10, 2011, the Federal Circuit

reversed this Court's ruling, holding that "detect analyze" should be corrected to read "detect and analyze" [id.].

On December 12, 2011, the Defendants again filed a Motion for Summary Judgment [Doc. 280]. The Defendants assert that there is no issue of material fact that the MTAs, Bonded Sender List, and Sender Certified List infringe the 550 Patent. Further, the Defendants contend that Claim 13 of the 550 Patent is invalid because it was anticipated and obvious in light of prior art.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

A.    Non-Infringement

        1.    Direct Infringement

The Defendants contend that the MTAs do not directly infringe the 550 Patent. The MTAs detect email and reference the SenderBase Server to determine whether an email message should be forwarded across the network.  In turn, the SenderBase Server analyzes more than 100 criteria to determine the sender's reputation score. Until 2006, one of the criteria the SenderBase Server referenced was the Bonded Sender List.  The Defendants argue that the SenderBase Server and MTAs did not "determine whether or not the sending party is an authorized sending party" by referencing the Bonded Sender List [Doc. 280-3].

The 550 Patent defines "authorized sending party" as a party "for whom an agreement to pay an advertising fee in return for allowing an electronic mail communication sent by the sending party to be forwarded over the network to an electronic mail address associated with the intended receiving party has been made" [id.].  Specifically, the Defendants contend that the Bonded Sender List does not identify "authorized sending parties" because it does not determine whether a party has paid "an advertising fee in return for allowing an electronic mail communication . . . to be forwarded over the network" [id.].

Entities on the Bonded Sender List paid three different kinds of fees: an application fee, an annual fee, and a bond. (Quinlan Dec. ¶¶ 9-10.) The Plaintiff argues that the Bonded Sender List included "authorized sending parties" because each of these fees was an "advertising fee" paid "in return for allowing an electronic mail communication . . . to be forwarded over the network" [Doc. 280-3]. Email senders paid an application fee upon applying for inclusion in the Bonded Sender List. (Quinlan Dec. ¶ 10.) This fee covered the administrative costs of reviewing the sender's application. (Id. ¶ 11.) Indeed, senders that were ultimately denied admission to the Bonded Sender List still paid the application fee. Such parties could not expect their email to be forwarded "in return" for their application fee. Thus, the application fee was not an advertising fee under the 550 Patent.

Parties on the Bonded Sender List were required to post a bond to ensure their good behavior. If Cisco received complaints related to a sender's email conduct, Cisco could assess a penalty against the bond. (Gibson Dec., Ex. D, at 11.) Again, the bond was not paid "in return" for allowing email to be forwarded over a network. Indeed, the bond was returned to the sender as long as the sender's email practices were not abusive. (Id.) Conversely, the more money forfeited from the bond, the less likely a party's email would be forwarded. (Id.) Indeed, if a sender drew enough complaints, it could have been removed from the Bonded Sender List. (Id.) Thus, the

bond was not an advertising fee paid "in return for allowing an electronic mail communication . . . to be forwarded over the network" [Doc. 280-3].

Finally, the Plaintiff contends that the annual fee was an "advertising fee."[1] Parties had to pay the annual fee to remain on the Bonded Sender List. The annual fee, however, was *not* paid "in return for allowing an electronic mail communication . . . to be forwarded over the network" [Doc. 280-3]. When the SenderBase Server determined a sender's reputation score, it consulted the Bonded Sender List, along with more than 100 other criteria. (Gibson Dec., Ex. D, at 12.) The sender's reputation score depended on a combination of these criteria. Based on that reputation score, the MTAs either allowed or prevented an email from traveling over the network. Being on the Bonded Sender List, however, did not guarantee that the MTAs would allow an email to be delivered. Indeed, the MTA's administrators could override the SenderBase Server's reputation score based on a variety of criteria. (Gibson Dec., Ex. D, at 14.)

---

[1] The Defendants contend that CBT did not allege that the annual fee associated with the Bonded Sender List was an "advertising fee" in the Plaintiff's infringement contentions. (See Defs.' Reply in Supp. of Defs.' Mot. for Summ. J., at 9-10.) Thus, the Defendants argue that CBT cannot make that argument now. The Court need not decide this issue, however, because, as discussed below, the annual fee associated with the Bonded Sender List is not given "in return" for allowing email to pass over the network.

Thus, by paying an annual fee, senders could expect to remain on the Bonded Sender List, increasing their reputation score in the SenderBase Server. In return for those fees, however, parties *could not* expect their emails to be forwarded by the MTAs. The Bonded Sender List, therefore, did not list "authorized sending parties" because senders on the Bonded Sender List did not pay a fee "in return for allowing an electronic communication sent by the sending party to be forwarded over the network" [id.].

Nevertheless, the Plaintiff argues that the MTAs, referencing the Bonded Sender List, infringed the 550 Patent under the doctrine of equivalents. The Defendants assert that CMT may not rely on the doctrine of equivalents because Claim 13 was added during the prosecution of the 550 Patent in response to the examiner's double patenting rejection. (See Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 22-23); see also Biagro Western Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1305 (Fed. Cir. 2005) (finding that narrowing amendment "made for a substantial reason relating to patentability" makes doctrine of equivalents presumptively unavailable with respect to that limitation). The Plaintiff contends that the examiner initially rejected the 550 Patent because it lacked a terminal disclaimer. CBT asserts that Claim 13 was not added directly in response to the examiner's

rejection [see Doc. 280-3, Ex. B].  The Court will therefore analyze the Plaintiff's claims under the doctrine of equivalents.

"An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused device either literally or equivalently."  Amgen Inc. v. F. Hoffman-LA Roche Ltd., 580 F.3d 1340, 1382 (Fed. Cir. 2009) (quoting Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1459 (Fed. Cir. 1998)).  "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art."  Id.  "Insubstantiality may be determined by whether the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation."  Id.  Finally, "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."  Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997).  "It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."  Id.

Here, the 550 Patent specifically provides that a computer will determine whether a sending party has paid "an advertising fee in return for allowing an

electronic mail communication sent by the sending party to be forwarded over the network" [Doc. 280-3].  Applying the doctrine of equivalents to include the annual fee, application fee, or bond would read out the claim requirement that the sender pay a fee *in return* for allowing email to pass over a network.  The Plaintiff argues, however, that the name of the fee is insubstantial and therefore the adjective "advertising" should not restrict the scope of the claim.  While the terminology may be inconsequential, Claim 13 specifically requires that the fee (whatever it is called) be paid *in exchange* for forwarding email.  The claim clearly contemplates that a sender's email *will* be forwarded if it pays an advertising fee.  As discussed above, the Bonded Sender List does not charge such a fee.  Thus, the Bonded Sender List  does not "performs substantially the same function in substantially the same way to obtain the same result as the claim limitation." <u>Amgen</u>, 580 F.3d at 1382.  For these reasons, there is no issue of material fact that the MTAs and SenderBase Server, using the Bonded Sender List, infringe Claim 13 of the 550 Patent.

Next, the Defendants contend that the MTAs and SenderBase Server do not infringe Claim 13 of the 550 Patent by referencing the Sender Certified List.  Again, the Defendants contend that the Sender Certified List does not list "authorized sending parties" because the members of that list do not pay an "advertising fee."  When Return Path acquired the Bonded Sender List, changing the name to the Sender

Certified List, it abolished the bond requirement. (Bilbrey Dec. ¶ 2.) Thus, entities on the Sender Certified List pay only an application fee and an annual fee. As discussed above, the application fee and annual fee are not "advertising fees" paid "in return for allowing an electronic mail communication . . . to be forwarded over the network" [Doc. 280-3]. Senders who pay fees to the Bonded Sender or Sender Certified List can expect their reputation score to increase. Those parties *cannot* expect their email to be forwarded across a network. Indeed, the MTAs, unlike the computer in the 550 Patent, do not base forwarding decisions on whether a party has paid an "advertising fee." Rather, the MTAs based forwarding decisions on the sender's reputation score given more than 100 criteria.[2]

Further, nonprofit companies on the Sender Certified List do not pay the annual fee. (Bilbrey Dec. ¶ 8.) The SenderBase Server, however, makes no distinction between parties that have paid the annual fee and those that have not. (Id.) Thus, even if the MTAs forwarded email from every entity on the Sender Certified List (which they do not), the MTAs could not determine which parties are "authorized sending parties" under the 550 Patent. For these reasons, there is no issue of material

---

[2]As discussed above, the MTA administrator may override the reputation score based on any number of criteria. (Gibson Dec., Ex. D, at 14.)

fact that the MTAs and SenderBase Server, referencing the Sender Certified List, infringe Claim 13 of the 550 Patent.

B.    Indirect Infringement

The Defendants argue that there is no issue of material fact that the Bonded Sender List and Sender Certified List indirectly infringe Claim 13 of the 550 Patent. As discussed above, the MTAs and SenderBase Server do not directly infringe Claim 13 of the 550 Patent by referencing the Bonded Sender and Sender Certified Lists. "Absent direct infringement . . . there can be neither contributory infringement, nor inducement of infringement."  Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir. 1986) (citations omitted).  For this reason, there is no issue of material fact as to the Plaintiff's indirect infringement claims with respect to the Bonded Sender List and Sender Certified List.

C.    Invalidity

The Defendants also argue that the 550 Patent is invalid.

1.    Anticipation

First, the Defendants contend that the 550 Patent was anticipated by prior art. "A patent is presumed valid, 35 U.S.C. § 282, and this presumption can be overcome only by clear and convincing evidence to the contrary."  Innovention Toys, LLC v. MGA Entertainment, Inc., 637 F.3d 1314, 1320 (Fed. Cir. 2011).  "In order for a prior

art reference to 'anticipate' a claim, it 'must disclose each and every element of the claim with sufficient clarity to prove its existence in the prior art.'" <u>Coca-Cola Co. v. PepsiCo, Inc.</u>, No. 102-CV-2887, 2004 WL 4910334, at *6 (N.D. Ga. Sept. 29, 2004) (quoting <u>Motorola, Inc. v. Interdigital Tech. Corp.</u>, 121 F.3d 1461, 1473 (Fed. Cir. 1997)). Finally, "[i]t is axiomatic that claims are construed the same way for both invalidity and infringement." <u>Source Search Techs., LLC v. LendingTree, LLC</u>, 588 F.3d 1063, 1075 (Fed. Cir. 2009) (quoting <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 314 F.3d 1313, 1330 (Fed. Cir. 2003)).

Second, the Defendants argue that the Dyson Reference anticipated the 550 Patent. The Dyson Reference anticipates that a computer will determine whether incoming email was sent by a party in the recipient's address book. If the sender is not in the recipient's address book, the recipient may offer to accept the message in return for a $1 fee paid by the sender. Unlike the 550 Patent, however, the Dyson Reference does not anticipate that a computer will determine whether a sender has paid an "advertising fee" before delivering email. Rather, the Dyson Reference anticipates that a computer will simply determine whether a sending party is in the recipient's address book. There is no indication that senders listed in the recipient's address book have paid an "advertising fee." Thus, the Dyson Reference does not

anticipate that a computer will deliver email based on whether a sender has agreed to pay an advertising fee.

Further, the 550 Patent contemplates that senders will pay an advertising fee *before* sending email. Indeed, senders must pay this fee before a computer will recognize them as "authorized sending parties." This fee is paid in return for allowing *all* authorized sending parties' email to pass over the network, regardless of volume. By contrast, the Dyson Reference contemplates that senders will pay a fee *after* sending a message. If unfamiliar senders wish to have their email delivered, they must pay $1 to each recipient. For these reasons, there is an issue of material fact that the Dyson Reference anticipates the 550 Patent.

Next, the Defendants argue that the Gates Reference anticipates the 550 Patent. The Gates Reference suggests that email senders will offer recipients money to "*look at* [the sender's] ad." [Doc. 280-3, Ex. I] (emphasis added). The Gates Reference does not contemplate that senders will pay an advertising fee to have their email delivered, but that senders will bid to have their email *read* by the recipient. As discussed above, the 550 Patent specifically states that the advertising fee will be paid "in return" for allowing an email message to be *forwarded* [Doc. 280-3]. Thus, there is an issue of material fact that the Gates Reference anticipates the 550 Patent.

Finally, the Defendants contend that the Sundsted Patent anticipates the 550 Patent. The Sundsted Patent contemplates that senders will attach an electronic stamp to email messages. Potential recipients will specify a desired value they are willing to accept to have the message delivered. If the value of the electronic stamp is greater than or equal to the recipient's desired compensation, the email will be delivered. Unlike the 550 Patent, however, the Sundsted Patent does not contemplate that senders will enter into an "agreement to pay an advertising fee *in return* for allowing an electronic mail communication . . . to be forwarded" [Doc. 280-3]. As with the MTAs and SenderBase Server products, senders cannot expect to have their email delivered "in return" for the price of the electronic stamp. See Source Search Techs., 588 F.3d at 1075 (quoting Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003)) ("[I]t is axiomatic that claims are construed the same way for both invalidity and infringement."). Indeed, depending on the recipient's desired compensation, the sender's emails may be delivered to some recipients and rejected by others. The Sundsted Patent therefore does not determine whether a sender is an "authorized sending party" that has already paid an advertising fee. Rather, the Sundsted Patent contemplates a computer that determines whether the sender's electronic stamp value meets the individual recipient's asking price. For this

reason, there is an issue of material fact that the Sundsted Patent anticipates the 550 Patent.

2.   Obviousness

Finally, the Defendants contend that the 550 Patent was obvious based on prior art.  "Under the Patent Act, '[a] patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" Innovention Toys, 637 F.3d at 1320 (quoting 35 U.S.C. § 103(a)).  "Although the ultimate determination of obviousness under § 103 is a question of law, it is based on several underlying factual findings, including (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, such as commercial success, long-felt need, and the failure of others."  Id.  Finally, "[r]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  KSR Intern. Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007) (quoting In re Kahn, 441 F.3d 977, 988 (Fed. Cir. 2006)).

Here, the Defendants contend that the elements missing from the three examples of prior art would have been obvious to someone with ordinary skill in the art. First, as discussed above, the prior art describes email filtering technology. The instances of prior art, however, are not particularly detailed. The Dyson Reference is an article that predicts future advancements in email delivery. Although the article discloses a fee charged to unfamiliar senders, the Dyson Reference does not explain the mechanics of such a system. Indeed, the author states such technology will "require the creativity of software vendors to build some better tools to enable their customers to set up different categories of e-mail and senders, handle the automated responses and payment details, and work with outside rating services that validate senders' labels." (Gibson Dec., Ex. G, at 121.) Similarly, the Gates Reference is found in a book about the future of email technology. It does not discuss the details of an email organization system or how to implement such a system in the future.

Further, the level of ordinary skill in the pertinent art is that of a layperson. The Defendants contend that "this technology is predictable and easily understandable." (See Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 37.) Indeed, the inventor of the 550 Patent, Michael Council, did not have any advanced or specialized skill in the art. Mr. Council testified that he had little familiarity with email or email systems. (See Gibson Dec., Ex. L.) Thus, to find that the 550 Patent was obvious, the Court

must find that the differences between the prior art and the 550 Patent would be obvious to a layperson. Innovention Toys, 637 F.3d at 1323 ("[N]o reversal is necessary where a district court makes a determination that an invention would have been obvious to one having the lowest level of skill, i.e., a layperson, because what is obvious to a layperson is necessarily obvious to one with a higher level of skill in the field of the invention."). This weighs against a finding of obviousness. See id. ("A less sophisticated level of skill generally favors a determination of nonobviousness, and thus the patentee, while a higher level of skill favors the reverse.")

Also, as discussed above, there are significant differences between the prior art and the 550 Patent. The Dyson Reference anticipates that recipients will offer to accept email from unfamiliar senders in exchange for $1 per message. Importantly, recipients would make this offer *after* the original unfamiliar email is rejected. The Gates Reference suggests that recipients would set a unique price senders must pay in return for having their email read. Whether or not the email is delivered, senders pay money in exchange for the reading, not the delivering. The Sundsted Patent states that senders will bid a certain amount of money (in the form of an electronic stamp) in return for the recipient accepting the sender's email. If the bid meets a particular recipient's demand, the email is delivered. None of the prior art, however, discusses

technology that makes determinations based on a sender's *agreement* to pay an advertising fee. Under the 550 Patent, the computer only forwards email if the sender has *already* paid an advertising fee. The prior agreement entered into by the sender is an important difference between the prior art and the 550 Patent.

Finally, the Defendants contend that "no secondary considerations of non-obviousness . . . could overcome the strong prima facie case of obviousness here." (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 40.) The Defendants, however, do not address any secondary considerations such as commercial success, copying, or unexpected results. The Plaintiff, by contrast, notes that Cisco paid $830 million in cash and stock for IronPort Systems, Inc. the company that developed the MTA technology. (See Werner Aff., Ex. 6; Doc. 284-9.) Thus, at a minimum, the secondary factors are neutral. Balancing these factors, the 550 Patent would not have been obvious to a person of ordinary skill in the art. For these reasons, there is an issue of material fact as to whether the 550 Patent is valid.

## IV. Conclusion

For the reasons set forth above, the Court GRANTS the Defendants' Motion for Summary Judgment [Doc. 280].

SO ORDERED, this 27 day of April, 2012.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge